# EXHIBIT A

TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| | : | |
| OPINION | : | |
| | : | No. 23-1001 |
| of | : | |
| | : | July 3, 2025 |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| KARIM J. KENTFIELD | : | |
| Deputy Attorney General | : | |

The HONORABLE TOM LACKEY, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on a question relating to the legality of "daily fantasy sports" games.

## QUESTION PRESENTED AND CONCLUSION

Does California law prohibit the operation of daily fantasy sports games with players physically located within California, regardless of whether the operators and associated technology are located outside the State?

Yes, California law prohibits the operation of daily fantasy sports games with players physically located within California, regardless of where the operators and associated technology are located. Such games constitute wagering on sports in violation of Penal Code section 337a.

## BACKGROUND

California and other States have long regulated attempts to win money based on the outcome of sporting events.[1]  This opinion concerns a modern variation on that activity, known as daily fantasy sports, in which participants try to win money based on the performance of selected professional or collegiate athletes in real-world sports games. To place daily fantasy sports in context, we will first describe traditional forms of sports wagering—which California law generally prohibits, but many other States now allow.[2] We will then describe the operation of daily fantasy games.

### Traditional Sports Betting

In traditional sports wagering, participants pay for the chance to win money based on the performance of third-party athletes.  Modern sportsbooks allow wagering on a variety of sports.  In Nevada, for instance, bettors can wager on football, basketball, baseball, golf, tennis, and horse racing, among other professional and collegiate sports.[3]

Once a sport is selected, wagering can focus on any game attribute.  Bettors may attempt to predict which player or team will win, or by how many points.[4]  Or they can place what is known as a "proposition" bet, where they predict results other than the final score.[5]  In basketball, for instance, a bettor might predict whether a particular player will score at least 20 points in a game, or whether a player in one game will collect more rebounds than a player in a different game.  Online sportsbooks also offer a wide array of "in-game" proposition bets, in which bettors act in real time to predict the result of an upcoming play.[6]

---

[1] See generally Davies & Abram, Betting the Line: Sports Wagering in American Life (2001) (Betting the Line).

[2] See generally American Gaming Association, State of the States 2024 (May 2, 2024), p. 2, https://www.americangaming.org/wp-content/uploads/2024/05/AGA-State-of-the-States-2024.pdf (sports wagering is legal in dozens of States).

[3] See Cabot & Miller, Sports Wagering in America: Policies, Economics, and Regulation (2018) pp. 1-5 (Sports Wagering in America).

[4] See *id.* at pp. 5-17; Betting the Line, *supra*, at p. 172.

[5] See Sports Wagering in America, *supra*, at p. 22; Betting the Line, *supra*, at p. 176.

[6] See generally Funt, *Watching the Super Bowl? Bettor Beware*, Wall Street Journal (Feb. 11, 2023) (reporting analyst's prediction that in-game betting would soon account for the "overwhelming majority" of U.S. sportsbook revenue).

Bets may also be stacked into a "parlay" wager, where a bettor makes multiple predictions.[7]  Horse-race wagering, for example, offers "exotic" parlay bets such as the "daily double" and "pick six," which require the bettor to predict the winners of two or six races, respectively.[8]  Sportsbooks may also offer long-term "futures bets," such as predicting which team will win the championship at the end of a season.[9]

Sports bettors may wager against the sportsbook operator itself or against other bettors.  In bets placed against the operator, the sportsbook has a financial stake in the outcome:  if the player wins the bet, then the operator loses, and vice versa.[10]  Payouts are commonly fixed by the operators in advance based on their assessment of likely outcomes.[11]  Alternatively, bettors may wager against other participants.  In pari-mutuel betting on horse races, for example, the operator acts as a neutral facilitator:  collecting bets from all players, retaining a portion for itself, and paying out the remainder to the winners.[12]  Payouts in the pari-mutuel system fluctuate based on the amounts wagered and the number of participants who select the winning outcome.[13]

As these examples illustrate, traditional sports wagering can take many forms.  Indeed, to satisfy the public's desire for "product diversity and new forms of wagering," sportsbooks "have increasingly offered their customers a veritable smorgasbord of wagering gimmicks."[14]  Whatever the formula, the determination of who wins or loses is "based on a future contingent event"—namely, the "outcome of the sports competition"—that is "not under the control of the sportsbook or the bettor."[15]

---

[7] See Betting the Line, *supra*, at p. 172 ("A parlay is a series of two or more bets set up in advance so that the original bet plus its winnings are risked on successive bets").

[8] Sports Wagering in America, *supra*, at p. 25.

[9] See Betting the Line, *supra*, at pp. 178-179.

[10] See *id.* at p. 171 (explaining that if the sportsbook does not manage its risk properly across all wagers, then it "is at risk for a loss—sometimes major").

[11] See Sports Wagering in America, *supra*, at pp. 5-23 (discussing different types of wagers and payout structures); Betting the Line, *supra*, at pp. 170-179 (same).  For example, in a parlay bet requiring the participant to correctly predict the results of three different football games—a difficult task—the sportsbook might promise to pay a winner $600 for every $100 wagered.

[12] See Sports Wagering in America, *supra*, at pp. 25-26.

[13] See *ibid.*; Betting the Line, *supra*, at pp. 169-170.

[14] Betting the Line, *supra*, at p. 174; see, e.g., *id.* at pp. 174-176 (describing "teaser" and "pleaser" parlay bets).

[15] Sports Wagering in America, *supra*, at p. 5.

### Daily Fantasy Sports

Like traditional sports wagering, daily fantasy sports games enable participants to win or lose money based on the outcome of sporting events played by third-party athletes.  Many daily fantasy sports variations are available.  We will focus on the two most popular formats:  "draft style" games and "pick'em" games.[16]

***Draft Style Games***.  In traditional draft style fantasy sports games, each player selects a team of real-world athletes from a designated sports league, such as the National Football League or the National Basketball Association.  In drafting their team, fantasy players may face constraints.  For example, they may have to select athletes from different positions or different real-world teams.  Once drafting is complete, players accumulate fantasy points based on their selected athletes' performance in real-world sporting events—such as runs batted in by a baseball player, or rebounds collected by a basketball player.  Players compete against each other to accumulate the highest aggregate point total.  As in traditional sports wagering, fantasy players do not compete in sporting events themselves and are not permitted to influence the sports competitions that determine the game winners.

Fantasy sports originated with season-long competitions, often organized among friends with low financial stakes.[17]  In this type of game, players select a roster of professional athletes before the sports season begins.  Each week of the season, players then select a subset of their athletes as their "starting lineup" and earn fantasy points based on their lineup's performance that week.  Players may be able to alter their roster during the season by acquiring new athletes, or trading athletes with other players.  The winning player is determined at the end of the season.

The request here concerns a newer game variation known as daily fantasy sports.  As with the season-long version, daily fantasy players seek to win prizes by selecting a team of real-world athletes with the strongest performance in upcoming sporting events.  Unlike season-long contests, however, daily fantasy competitions are decided by each athlete's performance in a single game.  As a result, daily fantasy winners can often be determined in a few days to a week.

Draft style daily fantasy games may use various methods for players to draft their roster of athletes.  One common method is a "salary cap draft," in which the operator assigns each athlete a salary based on the athlete's expected performance.  Each daily

---

[16] Our description of daily fantasy game mechanics is based on the information provided to us by various game operators.

[17] See generally Berry, *Untold stories of 40 years of fantasy baseball*, ESPN (Mar. 4, 2020), https://www.espn.com/fantasy/baseball/story/_/id/28838799/untold-stories-40-years-fantasy-baseball.

23-1001

fantasy player then selects a team of athletes whose total salary in the aggregate is below a specified limit, the "salary cap." Players draft their teams independently, and a given athlete may be selected by multiple players. In other games, players may select athletes using a different procedure such as a "snake draft" or an "auction draft."[18] Whatever method is used, once a player has picked athletes, those selections are locked in and there are no further decisions to make. The winning players are then determined by the on-field performance of the selected athletes in their next single sporting event.

Multiple service providers currently offer draft style daily fantasy games in California. Those providers hold games on their websites, and players access them via computer or mobile device. Game formats vary widely. Some games allow hundreds or thousands of entrants, while others are limited to two players competing "head-to-head." Games may pay large prizes to only the highest-scoring players—sometimes as large as $1 million—or they may pay small prizes to a greater percentage of participants. Game operators typically charge a fixed entry fee, which may range from a few dollars to hundreds or even thousands of dollars. And they typically pay pre-announced prizes, regardless of how many players enter. The prize payouts reflect the total expected entry fees paid minus a fee retained by the operator.[19]

***Pick'em Games.*** In recent years, a second style of daily fantasy contest known as pick'em has emerged. In this variation, a player selects a "team" of real-world athletes, typically two to five. The player must then predict each athlete's performance in a single upcoming game on a specified metric, such as points scored or rebounds collected in a basketball game. The operator provides a threshold number in the selected category—for example, 20 points or 7 rebounds—and the player must predict whether the athlete will perform above or below that threshold. Players typically must select athletes from multiple real-world teams and cannot use the same athlete in multiple predictions.

In traditional pick'em games, players compete "against the house"—the operator—not against other players as in the draft style games. Players pay an entry fee of any amount and win a prize if they make all predictions correctly (or almost all, in certain variations). The operator calculates prizes based on the size of the entry fee and

---

[18] In a "snake draft," players select athletes in a specified order, with the draft order reversing every round. In an "auction draft," players are given a fictional budget to bid on athletes.

[19] The following example, based on a real draft style daily fantasy game offered on July 12, 2024, is illustrative. The operator charged a $15 entry fee and set a maximum of 7,843 entrants. Each player could enter up to 150 separate times. The operator guaranteed that $100,000 in prizes would be distributed, regardless of the number of entrants. Prizes began at $20,000 for first place, decreasing to $35 for finishing between 701st and 1835th place. If the operator sold all available entries, it would have retained approximately 15% of the entry fees after paying all prizes.

the number of predictions attempted.  For example, in one operator's game, paying a $100 entry fee will win $300 for two correct predictions, $500 for three correct predictions, and $1,000 for four correct predictions.

This opinion request asks whether California law prohibits offering daily fantasy sports games to players physically located within the State.  Because the request does not specify any particular daily fantasy variant, we will focus our analysis on the widely available game formats described above.

## ANALYSIS

Since becoming a State, California has regulated gambling activities.[20]  Today, Article IV, section 19 of the state Constitution prohibits lotteries and the sale of lottery tickets, subject to exceptions including the California State Lottery, charitable bingo games, and nonprofit raffles.[21]  Section 19 also directs the Legislature to prohibit "casinos of the type currently operating in Nevada and New Jersey."[22]  But section 19 authorizes the Governor to negotiate compacts with federally recognized Indian tribes to operate certain gambling activities on tribal lands.[23]  And section 19 also authorizes the Legislature to regulate horse racing and horse-race wagering.[24]

Consistent with the Constitution, the Legislature has "prohibited certain forms of gambling and allowed others."[25]  Subject to various exceptions, the Penal Code prohibits "three key forms of gambling":  "gaming, lotteries and betting."[26]  "Gaming may be defined as the playing of any game for stakes hazarded by the players."[27]  "A lottery may be defined as a distribution of prizes by lot or chance" for consideration.[28]  And betting "may be defined as promises to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way, and (unlike a lottery) may

---

[20] See 71 Ops.Cal.Atty.Gen. 139, 141 (1988).

[21] See Cal. Const., art. IV, § 19, subds. (a), (c), (d), (f).

[22] *Id.*, subd. (e).

[23] *Id.*, subd. (f).

[24] *Id.*, subd. (b).

[25] 71 Ops.Cal.Atty.Gen., *supra*, at p. 141.

[26] *Western Telcon, Inc. v. California State Lottery* (1996) 13 Cal.4th 475, 484, internal quotation marks omitted (*Western Telcon*); see Penal Code, Part 1, Title 9, Chapters 9-10.

[27] *Western Telcon*, *supra*, 13 Cal.4th at p. 484, internal quotation marks omitted; see Penal Code, § 330 et seq.

[28] *Western Telcon*, *supra*, 13 Cal.4th at pp. 484-485, internal quotation marks omitted; see Penal Code, § 319 et seq.

23-1001

involve skill or judgment."[29]  Gambling activities that are not prohibited by the Penal Code are permitted in compliance with state and local regulation.[30]

We received numerous public comments arguing that daily fantasy sports either are or are not prohibited by various constitutional and statutory provisions.  In line with most comments, we will focus on two provisions:  (1) Penal Code section 337a, which prohibits wagering on sports, and (2) Penal Code section 319 et seq., which prohibit lotteries.  We conclude that daily fantasy sports games constitute sports wagering and therefore violate section 337a.  While we are unable to conclude whether such games *also* violate the lottery prohibition—because that analysis would require making factual determinations outside the scope of an Attorney General legal opinion—it is unnecessary to resolve the latter question in light of our conclusion that California law independently prohibits such games under section 337a.[31]

**Daily Fantasy Sports Games Violate Penal Code Section 337a Because They Involve Betting on Sports**

California law prohibits betting or wagering on sporting events.[32]  Under Penal Code section 337a(a)(6), it is a crime if a person

[l]ays, makes, offers or accepts any bet or bets, or wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus.

---

[29] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks and alterations omitted; see Penal Code, § 337a.

[30] See generally Bus. & Prof. Code, § 19800 et seq. (Gambling Control Act); *Western Telcon*, *supra*, 13 Cal.4th at p. 482, fn. 2, citing *In re Hubbard* (1964) 62 Cal.2d 119, 123-128 (state law does not preempt all local regulation of gambling activities).

[31] Similarly, given our conclusion that section 337a prohibits daily fantasy sports games, we need not consider whether they might violate other legal provisions that regulate gambling activities.  (See, e.g., Cal. Const., art. IV, § 19, subd. (e) ["The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey"]; Penal Code, § 330 [prohibiting "any banking or percentage game played with cards, dice, or any device, for money"]; *id.*, §§ 330a, 330b, 330.1 [prohibiting certain gambling devices].)

[32] As an exception, California law permits pari-mutuel wagering on horse races.  (See Bus. & Prof. Code, § 19400 et seq.)  Although section 337a originally prohibited all forms of sports betting including wagering on horse races, the voters later amended the state Constitution to permit horse-race wagering.  (See Cal. Const., art. IV, § 19, subd. (b).)

23-1001

The California Supreme Court has defined bets or wagers "as promises to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way."[33]   And "unlike a lottery," which as discussed below requires that chance predominate over skill, betting "may involve skill or judgment."[34]   Section 337a also prohibits related offenses, such as recording bets and bookmaking.[35]

We conclude that participants in both types of daily fantasy sports games— pick'em and draft style games—make "bets" on sporting events in violation of section 337a.  We discuss the two game formats in turn.

### Pick'em Games

In pick'em, players try to win money by predicting the performance of individual athletes in a single real-world game—for example, whether Steph Curry will score more or fewer than 20 points, or whether Jimmy Butler will grab more or fewer than 7 rebounds.  We conclude that pick'em violates section 337a because the game's entry fees are "bets" or "wagers" placed "upon the result . . . of [a] trial . . . or contest . . . of skill, speed or power of endurance of person . . . or between persons."[36]

As with many traditional sportsbook bets, pick'em players place a bilateral wager against the game operator.  The player and operator each "promise[] to give money . . . upon the determination of an uncertain or unascertained event" (the sports competitions) being resolved "in a particular way" (whether the player's predictions of athletic

---

[33] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks and alterations omitted; see also *Ex parte McDonald* (1927) 86 Cal.App. 362, 367 (citing Black's Law Dictionary to define a "bet" as "an agreement between two or more persons that a sum of money or other valuable thing shall become the sole property of one or more of them on the happening in the future of an event at present uncertain"); *ibid.* ("bet" and "wager" are synonyms); CALCRIM No. 2996 (defining "bet" as an "agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value"; a "bet includes a wager made on the outcome of any actual or purported event, including . . . any kind of sporting contest").

[34] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks omitted; see *post*, fns. 161-167 (discussing lottery elements).

[35] See Penal Code, § 337a, subd. (a)(1)-(5); CALCRIM No. 2990 ("*Bookmaking* includes the taking of bets, either orally or recorded in writing"); CALCRIM No. 2994 ("*Recording* a bet means making a notation on paper, or using any other material or device, to allow winnings on the bet to be distributed in the future"); *People v. Lomento* (1957) 155 Cal.App.2d 740, 742.

[36] Penal Code, § 337a, subd. (a)(6).

performance are correct).[37]  Like other kinds of wagers, both parties have a financial stake "in the outcome of the game, because the amount of money the operator will have to pay out depends upon whether each of the individual [player's] bets is won or lost."[38] And the real-world sporting events clearly constitute "trial[s]" or "contest[s] . . . of skill, speed or power of endurance of person . . . or between persons."[39]  Section 337a(a)(6) therefore applies.  Indeed, pick'em appears materially indistinguishable from a classic form of sports wagering:  a "parlay" or combination of proposition bets over different game outcomes.[40]

Our conclusion is consistent with the view of out-of-state regulators.  Regulators in Virginia, Arizona, Wyoming, and Florida, for example, have all concluded that state laws regulating sports wagering apply to pick'em.[41]  As the Arizona Department of Gaming explained, the games are simply a type of "proposition bet[ting]."[42]  We are not aware of any out-of-state regulator to reach a contrary conclusion.

The pick'em operators offer several arguments that section 337a does not apply, but we are not persuaded.  First, the operators contend that skill predominates over chance in pick'em—that is, that success in pick'em depends more on skill and judgment than luck or chance.  As discussed below, this argument is directly relevant to a lottery analysis:  for a game to be prohibited as a lottery under California law, chance must predominate over skill.[43]  But that is not a requirement for a "bet" or "wager" under section 337a:  the California Supreme Court has explained that, "unlike a lottery," betting or wagering "may involve skill or judgment."[44]  The operators have not cited a single authority construing section 337a(a)(6) to require that chance predominates.[45]  Nor are

---

[37] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks omitted; see *ante*, fn. 33 (citing similar definitions of a "bet" or "wager").

[38] *Western Telcon*, *supra*, 13 Cal.4th at p. 488 (distinguishing a bilateral wager from a prize, where the operator has no financial stake in who wins).

[39] Penal Code, § 337a, subd. (a)(6).

[40] See *ante*, fns. 5-8 (describing traditional proposition bets and parlays).

[41] See, e.g., 2023 Ops.Va.Atty.Gen. 133 (Dec. 12, 2023); Wyoming Gaming Commission, letter to PrizePicks, July 5, 2023, on file; Florida Gaming Control Commission, letter to Betr, Sept. 19, 2023, on file.

[42] Arizona Department of Gaming, letter to Arizona Fantasy Sports Contest Operators, Nov. 1, 2023, on file.

[43] See *post*, fns. 161-167.

[44] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks omitted.

[45] The primary authorities cited by the operators do not even concern section 337a.  (See,

(continued…)

23-1001

we aware of any authorities imposing such a requirement, either in California or any other State with similar laws.[46]  Rather, the essential requirement of a "bet" or "wager" is that participants win or lose based on the outcome of an uncertain future event, such as a sports competition, even if skilled bettors consistently come out ahead.[47]

That understanding reflects the statute's purpose.  The Legislature enacted section 337a in 1909 out of concern that horse-race wagering had resulted in addiction and financial ruin.[48]  The statute's proponents denounced "the ruinous effect of . . . racetrack gambling," which led some patrons to "steal[] from their employers in order to gamble at the races."[49]  Proponents likened racetrack betting to an "infectious disease," "easily

---

e.g., *Knowles v. O'Connor* (1968) 266 Cal.App.2d 31, 33 [discussing the chance requirement for slot machines under Penal Code sections 330b and 330.5].)

[46] See, e.g., CALCRIM No. 2996 (jury instructions for a section 337a(a)(6) violation, which do not require proving that chance dominates); *People v. Postma* (1945) 69 Cal.App.2d Supp. 814, 817-818 (concluding that horse-race wagering constituted betting without deciding whether skill or chance predominated).

[47] See Penal Code, § 337a, subd. (a)(6); *ante*, fn. 33.

[48] See Stats. 1909, ch. 28, § 1, p. 21 (enacting section 337a); see also Stats. 1911, ch. 7, § 1, p. 4 (amending § 337a to add former subd. 6., now subd. (a)(6)).  Although we are not aware of any legislative history from section 337a's enactment, the statute's purpose is well documented in the historical record.  (See *post*, fns. 49-51; e.g., *People v. Martinez* (2023) 15 Cal.5th 326, 350, fn. 16 [relying on work of historians and contemporaneous newspaper articles to aid in interpretation of a California regulation]; *Comm. of the Rts. of the Disabled v. Swoap* (1975) 48 Cal.App.3d 505, 511 [courts can consider the "historical background" of statutes]; *McGarrahan v. Maxwell* (1865) 28 Cal. 75, 95 [courts may look "'to the public history of the time in which [a statute] was passed'"].)  Section 337a's purpose is also reflected in case law preceding its enactment. (E.g., *Gridley v. Dorn* (1880) 57 Cal. 78, 79 [betting on horse races was "against good morals or sound public policy" because betting "'tends directly to beget a desire of possessing another's money or property'"]; *Hankins v. Ottinger* (1896) 115 Cal. 454, 458 [the "gain and loss between the parties" in betting can "excite a spirit of cupidity," internal quotation marks and italics omitted]; cf. *Tak Chun Gaming Promotion Co. v. Long* (2023) 96 Cal.App.5th 1027, 1039 [common law anti-gambling rules were intended to discourage the "financially ruinous consequences" of gambling debts].)  And although the Legislature has amended section 337a on a few occasions—for example, to modify the penalties—it has not altered the section's substantive reach in any relevant respect. Accordingly, authorities from the era when the section was enacted continue to illuminate the Legislature's intent.

[49] *To Fight Gambling On Races*, Los Angeles Evening Express (Dec. 17, 1908) p. 1,

(continued…)

10

caught and exceedingly hard to shake off."[50]  And they cautioned that bettors who lost might wager increasing amounts in a futile attempt to recover their losses.[51]  These adverse outcomes are all possible even if sports wagering is a skill-dominant activity, such as if success depends on skillfully analyzing prior athlete performance, matchups, or weather conditions.  Indeed, if skill did predominate, concerns about bettors chasing their losses to financial ruin would be exacerbated because less skillful bettors would consistently lose.  Moreover, some authorities have concluded that skill predominates in racetrack betting and other types of traditional sports wagering.[52]  Reading section 337a to apply only if chance predominates could therefore risk legalizing forms of ordinary sports betting that the Legislature intended to prohibit.  For these reasons, whether or not skill predominates in wagering on horse races, football games, or pick'em, section 337a(a)(6) applies.[53]

Second, the operators emphasize that pick'em game winners are determined not based on the overall winner of sports games, but by other game attributes—such as an individual athlete's point total or rebounds collected.  They argue that section 337a(a)(6)

[50] *Racetrack Gambling*, San Jose Mercury News (Jan. 11, 1909) p. 6, col. 1 (editorial); see *The Gambling Evil*, Los Angeles Herald (Apr. 18, 1909) p. 4, col. 2 (editorial supporting statute) ("Race track gambling . . . has been responsible for broken hearts, wrecked homes, ruined lives.  It has made defaulters and criminals of men who . . . [were] gripped by the gambling fascination").

col. 7, p. 2, col. 2 (quoting Arthur Letts); see Kilner, Arthur Letts, 1862-1923 (1927) pp. 230-232 (documenting work of Letts and his Business Men's Anti-Racetrack Gambling League of Southern California to spearhead law's enactment); see also *Out To Fight Gambling At Race Tracks*, Los Angeles Herald (Dec. 28, 1908) p. 8, cols. 1-2.

[51] *To Fight Gambling On Races*, Los Angeles Evening Express, *supra*, p. 2, cols. 2-3 ("A man goes innocently to see the races . . . .  He bets a dollar and loses it, and then he has two up.  Next he is betting his employer's money in the mad hope that he will get back what he has lost"); see also *Dangers In All Forms of Gambling*, Los Angeles Evening Express (Feb. 13, 1909) p. 1, col. 7, p. 4, col. 1 (Arthur Letts) ("The temptation is so great.  It is so easy to begin . . . .  The loss is slight at first, but it grows and grows, and the loser, bent on regaining his losses, strains every energy to win").

[52] See, e.g., *People v. Postma*, *supra*, 69 Cal.App.2d Supp. at p. 817 (describing the majority view of out-of-state authorities that skill predominates in betting on horse races); Ops.W.Va.Atty.Gen., 2016 WL 3857081, 5-6 (July 7, 2016) (describing prior Attorney General opinion that skill predominates in traditional sports betting).

[53] Accord, e.g., Ops.Miss.Atty.Gen., 2016 WL 695680, *2, *4 (Jan. 29, 2016) (the existence of skill in picking a fantasy team was irrelevant to whether daily fantasy violated state law prohibiting sports wagering); Nev.Atty.Gen.Memo., Legality of Daily Fantasy Sports Under Nevada Law, at pp. 6-7 (Oct. 16, 2015) (similar).

therefore does not apply because the statute prohibits betting only on the "result" of a sporting event. We disagree. Dictionaries define "result" as a "consequence or outcome."[54] In our view, a sports competition has many "consequences" or "outcomes." Some of those outcomes determine the game winner, such as the relative point totals scored by each team. Many other outcomes do not determine the game winner, such as the points scored by individual players. The operators have not provided any definition of "result" that would limit the term to the former type of "consequence" or "outcome," but not the latter. Nor have they cited any authority construing section 337a or any similar statute to prohibit wagering on only the game winner or loser—that is, to allow proposition betting.[55]

Such a reading would also be inconsistent with both common understanding and statutory purpose. As described above, proposition betting on game results other than the winner is a widely available form of traditional sports wagering. By one estimate, in-game proposition betting—such as predicting the result of the next play—may soon account for a majority of online sportsbook revenues.[56] In our view, if the Legislature had intended to allow such an enormous category of traditional sports wagering, it would have done so more clearly. That conclusion is also consistent with the statute's policy concerns: to prevent addiction and financial harm.[57] We are not aware of any authority indicating that these risks are materially different for proposition betting than for other forms of sports wagering. If anything, the rapid nature of in-game proposition betting— where bets are placed on an upcoming play and resolved in minutes, if not seconds— might make addiction risks especially acute.

Third, the operators cite an out-of-state decision, *Las Vegas Hacienda, Inc. v. Gibson*, where the Nevada Supreme Court held that a golf course that offered a prize to any person who paid an entry fee and shot a hole in one did not engage in wagering.[58]

---

[54] American Heritage Dict. (5th ed. 2018) p. 1497 ["result"]; see also, e.g., Oxford English Dict. (updated through June 2025) ["result"] ("The effect, consequence, or outcome of some action, process, or design, etc.").

[55] Section 337a can also be understood to prohibit proposition betting in a different way. The section prohibits wagering "upon the result . . . of *any trial . . . or contest . . . of skill*, speed or power of endurance *of person* . . . or between persons." (Penal Code, § 337a, subd. (a)(6), italics added.) Nothing in the statute limits the relevant "trial" or "contest" to the overall event winner. Rather, a sports game could involve many "trial[s] . . . of skill . . . of person," such as whether Steph Curry will score more or fewer than 20 points, or Jimmy Butler will collect more or fewer than 7 rebounds. A proposition bet on the "result" of such a trial would then fall within the statute's reach.

[56] See *ante*, fn. 6.

[57] See *ante*, fns. 48-53.

[58] *Las Vegas Hacienda, Inc. v. Gibson* (1961) 77 Nev. 25, 29.

23-1001

The Court reasoned that the prize was a "reward or recompense for some act done" (the golf shot) and therefore not a "wager," which is "a stake upon an uncertain event."[59] Analogizing to *Gibson*, the operators argue that the prizes in pick'em are also awarded as a "reward or recompense for some act done":  the "act" of correctly predicting the outcome of third-party sports games.[60]  But applying that reasoning, *any* bilateral wager could be reconstrued as a "reward" for the "act" of correctly forecasting an uncertain event.[61]  That would effectively legalize all wagering, contrary to the Legislature's intent in enacting section 337a.  Accordingly, even assuming that a court applying California law to a hole-in-one prize would reach the same conclusion as *Gibson*, the reasoning of that case cannot be extended to pick'em games.  The Office of the Nevada Attorney General has similarly concluded that fantasy sports are distinguishable from the game at issue in *Gibson*.[62]

Fourth, the operators cite a federal statute, the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA).[63]  "UIGEA makes it illegal for a 'person engaged in the business of betting or wagering' knowingly to accept certain financial payments from an individual who is engaged in 'unlawful Internet gambling.'"[64]  Although the statute defines a "bet or wager" to include "risking . . . something of value upon the outcome of . . . a sporting event . . . upon an agreement . . . [to] receive something of value in the event of a certain outcome," it excludes from the definition participation in "fantasy or simulation sports game[s]" meeting certain criteria.[65]  The operators argue that the pick'em games fall within that exclusion.

But UIGEA's definition of "bet or wager" has no bearing on Penal Code section 337a.  UIGEA expressly states that "[n]o provision of [the statute] shall be construed as

---

[59] *Ibid.*

[60] *Ibid.*

[61] *Ibid.*

[62] See Nev.Atty.Gen.Memo., *supra*, at p. 11 ("In the case of daily fantasy sports, the primary 'act' at issue is that of choosing a lineup.  The completion of this 'act' will not, in itself, result in any prize.  The payouts in daily fantasy sports are not awarded to owners who simply set a lineup, they are awarded to the owners whose lineups receive the highest total score (which is dependent upon the *uncertain* outcomes associated with sporting events).  Accordingly, even applying *Gibson*, wagers are present in daily fantasy sports").  Although the Nevada Attorney General's Office distinguished *Gibson* in the context of analyzing draft style games, analogous reasoning applies to pick'em.

[63] See 31 U.S.C. § 5361 et seq.

[64] *State of California v. Iipay Nation of Santa Ysabel* (9th Cir. 2018) 898 F.3d 960, 965, quoting 31 U.S.C. § 5363.

[65] 31 U.S.C. § 5362, subd. (1)(A), (E)(ix).

altering, limiting, or extending any Federal or State law . . . prohibiting . . . gambling within the United States."[66]  As the Nevada Attorney General's Office observed, "UIGEA neither made legal nor illegal any form of gambling" but instead provided "'new mechanisms for enforcing gambling laws on the Internet.'"[67]  Consistent with that view, UIGEA's author has explained that although the statute exempts daily fantasy games from the new obligations UIGEA created, it "does not exempt fantasy sports companies from any other obligation to any other law"—including state betting prohibitions like section 337a.[68]  And as discussed below, other federal laws regulating "wagers" have been construed to apply to daily fantasy sports, notwithstanding UIGEA.[69]

Fifth, the operators invoke the rule of lenity, "whereby courts must resolve doubts as to the meaning of a statute in a criminal defendant's favor."[70]  "The rule of lenity exists to ensure that people have adequate notice of the law's requirements."[71]  As the California Supreme Court has explained, however, "the rule applies only when two reasonable interpretations of a penal statute stand in relative equipoise.  Although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative

---

[66] 31 U.S.C. § 5361, subd. (b).

[67] Nev.Atty.Gen.Memo., *supra*, at p. 7, quoting 31 U.S.C. § 5361, subd. (a)(4), alterations and emphasis omitted.

[68] Dahlberg, *Former congressman says [Daily Fantasy Sports] is "cauldron of daily betting,"* Associated Press (Oct. 12, 2015), https://apnews.com/united-states-house-of-representatives-united-states-government-house-elections-united-states-congress-general-news-7b3af0d8b0c04f059e8b301adf8b1784.  In the UIGEA author's view, "it is sheer chutzpah for a fantasy sports company to cite the law as a legal basis for existing"; there "is no credible way fantasy sports betting can be described as not gambling."  (*Ibid.*)

[69] See Internal Revenue Service, Office of Chief Counsel, Memorandum No. AM 2020-009, at pp. 8-9 (July 23, 2020) (concluding that daily fantasy sports entry fees are "wagers" under federal excise tax and rejecting claim that UIGEA affects the analysis), discussed *post*, fn. 112.

[70] *People ex rel. Green v. Grewal* (2015) 61 Cal.4th 544, 565, internal quotation marks omitted.

[71] *Ibid.*

14

intent."[72]  Here, "there is no relative equipoise."[73]  In our view, pick'em participants clearly place bets on the outcome of sporting events in violation of section 337a.[74]

Finally, it is not relevant that the game operators or associated technology may be located outside the State.  "Under California law, gambling activities are illegal in this state even though they are performed in connection with activities in another state or country where gambling is legal."[75]  Accordingly, we have previously opined that a person who is physically present in California would violate section 337a by placing bets over the telephone, regardless of whether the bets are legal where accepted.[76]  Likewise, a person physically present in California would violate section 337a by placing bets over the Internet on daily fantasy sports games.

### Draft Style Games

In draft style games, players compete against each other to see whose team of selected athletes has the strongest aggregate performance on designated metrics in each athlete's next real-world sports game.  We conclude that draft style games also involve betting on sports under section 337a(a)(6).  The game entry fees satisfy the definition of a "bet" or "wager" because players "promise[] to give money" based on "the determination of an uncertain or unascertained event" (the sports competitions) "in a particular way" (the relative aggregate performance of each player's selected team of athletes).[77]  As with pick'em, each player's financial success depends on the outcome of the underlying sports games.[78]  The sports games themselves constitute "contest[s] . . . of skill, speed or power

---

[72] *Ibid.*, internal quotation marks and alterations omitted; see also Penal Code, § 4 ("The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code.  All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice").

[73] *People ex rel. Green v. Grewal*, *supra*, 61 Cal.4th at p. 565.

[74] We are told that some operators offer pick'em as a peer-to-peer competition, in which participants compete against each other to make the highest number of correct predictions.  In our view, this version of pick'em also constitutes sports wagering because the entry fees satisfy the definition of a "bet" or "wager" under section 337a.  (See *post*, fns. 77-157 [explaining why the peer-to-peer draft style games violate section 337a].)

[75] 80 Ops.Cal.Atty.Gen. 98, 99 (1997), citing *Finster v. Keller* (1971) 18 Cal.App.3d 836, 849; *People v. Jones* (1964) 228 Cal.App.2d 74, 92.

[76] 80 Ops.Cal.Atty.Gen., *supra*, at p. 99.

[77] *Western Telcon*, *supra*, 13 Cal.4th at p. 485, internal quotation marks omitted; see also *ante*, fn. 33 (citing similar definitions of a "bet" or "wager").

[78] See *Western Telcon*, *supra*, 13 Cal.4th at p. 489 (explaining that the California State
(continued…)

23-1001

of endurance . . . between persons."[79]  And players accrue fantasy points based on the game "result[s]," namely each athlete's in-game performance.[80]

Our conclusion is again consistent with the view of out-of-state regulators.[81]  As the West Virginia Attorney General explained, state regulators have unanimously concluded that draft style daily fantasy games violate laws "prohibit[ing] wagers on any games of skill or sport."[82]  In the words of the Mississippi Attorney General:

> When a player places a wager and picks a lineup for a [draft style] Daily Fantasy Sports contest, each selection is locked-in once the chosen athletes begin[] their real world competition. . . .  [W]inners are selected based on the tally of points earned by the athletes.  This method of play is similar to betting on a horse race or making a parlay bet . . . .  It is different from betting on the outcome of a regular football game only in that the player can choose from any number of hypothetical "teams" which the player can possibly pick or create, rather than being limited to picking from the teams available as they actually exist in the NFL.[83]

To be sure, in some of these States, the Legislature has subsequently legalized draft style games.  We are told that 24 States have amended their laws to expressly allow designated fantasy sports activities.[84]  But the policy decision to treat fantasy sports differently from other sports wagering does not undercut the reasoning of the above

---

Lottery wagered on an uncertain event because its "financial success . . . depend[ed] . . . on the [event's] outcome").

[79] Penal Code, § 337a, subd. (a)(6).

[80] *Ibid.*; see *ante*, fns. 54-57 (explaining that the "result" of a sports game under section 337a includes game attributes beyond the winner or loser).

[81] See, e.g., Nev.Atty.Gen.Memo., *supra*, at pp. 8-12; Ga.Atty.Gen.Memo., Re: Daily fantasy sports games, at p. 3 (Feb. 26, 2016) (a draft style game entry fee "clearly constitutes a 'bet'"); Ops.Tex.Atty.Gen. No. KP-0057, at pp. 3-7 (2016).

[82] Ops.W.Va.Atty.Gen., 2016 WL 3857081, *supra*, at p. 13 (citing regulator action in Arizona, Illinois, Florida, North Dakota, and Vermont).

[83] Ops.Miss.Atty.Gen., 2016 WL 695680, *supra*, at p. *2; see also Nev.Atty.Gen.Memo., *supra*, at p. 9 ("[D]aily fantasy sports owners pay money to play the simulated games and compete with each other based on their total scores.  If an owner wins, the owner gets money back.  If an owner loses, the owner loses the bet made.  When owners play against each other, some will win and some will lose.  Thus, because owners risk money on an occurrence for which the outcome is uncertain, wagers are present").

[84] See, e.g., 2023 Ops.Va.Atty.Gen., *supra*, at p. 135 (under Virginia law, conduct "that otherwise would constitute illegal gambling is permitted in some circumstances" by statute, including betting on fantasy sports).

Attorney General opinions.  Under the ordinary meaning of state laws prohibiting sports betting, entry fees in draft style games constitute bets or wagers on sports—unless and until the state Legislature or the electorate change those laws.  We are not aware of a single state or federal regulator concluding that a statute like section 337a that prohibits all types of sports betting does not bar draft style games.

We find nothing in case law to alter our conclusion that section 337a applies to the draft style games.  In several cases, courts have held that certain contest entry fees did not constitute bets or wagers.  In *Hankins v. Ottinger*, for example, the California Supreme Court considered horse owners who paid an entry fee to enter their own horse in a racing contest that awarded prizes.[85]  The Court held that the entry fee was not a bet or wager, but a fee paid for the privilege of participating in the race.  "Trials of speed between horses," the Court explained, "are not in themselves" legally disfavored.[86]  As a result, the "giving of purses or premiums by associations . . . not themselves competing, for the purpose of encouraging such contests," was not forbidden either.[87]  "Were these things unlawful," the Court reasoned, many local agricultural competitions would also be prohibited, as offering a prize "for the fastest racehorse is not distinguishable" from awarding prizes for other desirable livestock qualities.[88]  But the Court distinguished racing contests among horse owners from *wagering* on such contests:  the law did not disfavor the races themselves, but it did disfavor "betting or wagering on" those races.[89]

Applying *Hankins*, California courts have distinguished between *participating* in a contest and *wagering* on a contest.  In *Ex parte McDonald*, for example, a racetrack ran two simultaneous contests based on a single horse race:  a contest among horse owners to win the race, and a contest among spectators to predict the race winner.[90]  Both contests awarded prizes paid out of the same pool funded in part by entry fees, with the owners' prizes awarded first in an amount determined by the contest judges, and the spectators' prizes awarded second.[91]  The Court of Appeal noted that, under *Hankins*, a contest among horse owners to win a race did not constitute betting, even if the prizes were

---

[85] *Hankins v. Ottinger*, *supra*, 115 Cal. at p. 456.

[86] *Id.* at p. 458.

[87] *Ibid.*

[88] *Id.* at pp. 458-459.

[89] *Ibid.*; see also, e.g., *Brown v. Bd. of Police Comm'rs of City of Los Angeles* (1943) 58 Cal.App.2d 473, 477-479 (applying *Hankins* to hold that paying an entry fee to participant in a ball-tossing carnival game, which awarded cigars and other pre-announced prizes, did not involve betting or wagering).

[90] *Ex parte McDonald*, *supra*, 86 Cal.App. at pp. 363-366.

[91] *Ibid.*

funded in part by entrance fees.[92]  But the contest among spectators to *predict* the result of the race was illegal betting under section 337a.[93]

Courts in other States have similarly distinguished between participating in contests and wagering on the result of contests undertaken by others.  In *State v. American Holiday Association, Inc.*, for example, the Arizona Supreme Court held that fees paid to enter a mail-in word game did not constitute bets under an Arizona statute prohibiting wagering on games of skill or chance.[94]  "It would be patently absurd," the Court explained, to conclude that the mere "combination of an entry fee and a prize equals gambling."[95]  If that were so, then spelling bees, "golf tournaments, bridge tournaments, . . . rodeos or fair contests, and even literary or essay competitions are all illegal gambling operations" under Arizona law.[96]  Paying a reasonable entry fee to participate in these types of contests did not constitute betting, the Court held, if the sponsor did not compete for the prizes and prizes were pre-announced and did not depend on the entry fees paid.[97]

But the Court distinguished participating in a contest and wagering on a contest of others.  "Spelling bees [and] golf tournaments," the Court explained, "are not like most bookmaking operations because prizes are not awarded on the basis of *the outcome of some event involving third parties*."[98]  Rather, the "prize offered is paid only to participants and the participants themselves determine the outcome."[99]  In contrast, winning money by predicting the result of a horse or dog race involved betting because the entrant "is not a participant" in the race itself.[100]  The "money laid down" in these activities "is not an entrance fee but a wager between parties who are not contestants and *whose gain or loss will be determined by the results of a game played by others*."[101]

---

[92] *Id.* at p. 366.

[93] *Id.* at pp. 366-368.

[94] *State v. Am. Holiday Ass'n, Inc.* (1986) 151 Ariz. 312; see *id.* at p. 313, citing A.R.S. § 13-3307, subd. (A) ("[N]o person may engage for a fee . . . in the business of accepting, recording or registering any bet . . . [or] wager . . . with respect to the result . . . of any race, sporting event, contest or other game of skill or chance").

[95] *State v. Am. Holiday Ass'n, Inc.*, *supra*, 151 Ariz. at p. 314, internal quotation marks omitted.

[96] *Ibid.*

[97] *Id.* at pp. 315-316.

[98] *Id.* at p. 314, italics added.

[99] *Ibid.*

[100] *Id.* at p. 317.

[101] *Ibid.*, italics added.

Thus, while paying an entry fee to compete in a spelling bee was not wagering, betting "on the winner of the national spelling bee" would be.[102]

Here, we conclude that draft style games do not fall within the contest-participant exception because players do not participate in sporting events but wager on the athletic performance of others. Unlike participating in a basketball tournament or spelling bee, where "prizes are not awarded on the basis of the outcome of some event involving third parties," a player's "gain or loss" in daily fantasy sports is "determined by the results of . . . [sports] game[s] played by others."[103] Daily fantasy games are thus like other "bookmaking operations," such as wagering on "horse racing and dog racing."[104] They are akin to wagering on the result of a golf tournament or spelling bee, not participating in one. Draft style game entry fees therefore do not fall within the contest-participant exception but instead constitute wagers on sports under the general definition.

The draft style games are similar to wagering on a contest in other respects as well. Generally, an individual who enters a golf tournament or a spelling bee can only compete in one (potentially lengthy) contest at a time. In contrast, for both traditional sports betting and daily fantasy games, an individual can bet or wager on numerous sporting events simultaneously or in rapid succession. Indeed, some daily fantasy operators allow an individual player to submit hundreds of separate entries for a single draft style game.[105] As a result, the risks of addiction and large losses—the chief concerns underlying section 337a—are particularly acute. And because the entry fees in draft style games vary from a few dollars to hundreds or even thousands of dollars, losing players can risk increasing amounts to try to recover their losses, further implicating the Legislature's concerns.[106]

Our conclusion that the draft styles games do not fall within the contest-participant exception is again consistent with the views of all other state and federal regulators who

---

[102] *Id.* at p. 314; accord, *Faircloth v. Cent. Fla. Fair, Inc.* (1967) 202 So.2d 608, 609 (Florida statute prohibited "'wagering' on the results of ball games, races, prize fights and the like as opposed to 'playing'" those games); *Grant v. State* (1947) 75 Ga.App. 784, 788 (distinguishing playing a baseball game and betting on the result of a baseball game; "'a wager is not a game but a bet of stakes upon the results of a game'").

[103] *State v. Am. Holiday Ass'n, Inc.*, *supra*, 151 Ariz. at pp. 314, 317.

[104] *Ibid.*

[105] See, e.g., *ante*, fn. 19 (describing example of daily fantasy game with $15 entry fee that allowed 150 entries per person, for a maximum of $2,250 wagered).

[106] See *ante*, fn. 51 (describing concerns about bettors chasing losses).

have examined similar questions.[107]  As the Mississippi Attorney General explained, "*participating* in foosball and pool tournaments for prizes is not prohibited" by a state law barring betting on game results, but "*betting* on" foosball or pool tournaments played by others "would be."[108]  The draft style games fall into the latter category:  they "involve[] a wager upon the performance of others," even if they are "in the form of a tournament or contest amongst players to pick the best teams." [109]  Similarly, the Ohio Attorney General explained that a "fundamental distinction" between golf tournaments or spelling bees and daily fantasy sports is that daily fantasy "participants have no direct link to the professional athletes whose performances ultimately determine whether a . . . participant wins or loses money."[110]  And the IRS Office of Chief Counsel reached the same conclusion in construing a federal statute that imposes an excise tax on any "wager."[111]  The Chief Counsel reasoned that playing a draft style game is not like *entering* a puzzle-solving contest, but instead is akin to *wagering* on the result of a puzzle-solving contest completed by others.[112]

That conclusion is also consistent with the Restatement of Contracts, which California courts have frequently looked to in construing state law.[113]  Section 520 of the

---

[107] See, e.g., Nev.Atty.Gen.Memo., *supra*, at p. 11 (draft style games involve wagering, in contrast to the hole-in-one golf shot in *Las Vegas Hacienda Inc. v. Gibson*, discussed *ante*, fns. 58-62); Ops.Tex.Atty.Gen. No. KP-0057, *supra*, at pp. 6-7 (distinguishing daily fantasy participants, "who pay entry fees for a chance to win a prize from *forecasting* the outcome of [sporting] events," from the "athletes [who] actually compet[e] in the sporting events," italics added); Ga.Atty.Gen.Memo., *supra*, at p. 4 (distinguishing between competing in a sporting event for a prize and betting on the result of a sporting event played by others, which describes daily fantasy sports); see also, e.g., Ops.Haw.Atty.Gen. No. 16-1, at pp. 6-7 (2016) (draft style games violated prohibition on "risk[ing] something of value upon the outcome of . . . a future contingent event not under [a person's] control or influence," the state law barring sports gambling).

[108] Ops.Miss.Atty.Gen., 2016 WL 695680, *supra*, at p. *4, italics added.

[109] *Ibid.*

[110] Oh.Atty.Gen.Memo., Daily Fantasy Sports Websites, at p. 7 (June 30, 2016).

[111] See 26 U.S.C. § 4401(a)(1)-(2).

[112] Internal Revenue Service, Office of Chief Counsel, Memorandum No. AM 2020-009, *supra*, at p. 8 (daily fantasy is not like entering a puzzle-solving contest but is like "choos[ing] a person or persons from a field of puzzle solvers who the contestant believed had the greatest chance of solving the most puzzles and . . . wagering based on that person or persons' expected performance").

[113] See, e.g., *Martinez v. Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 400-402; *Drennan v. Star Paving Co.* (1958) 51 Cal.2d 409, 413-416; *Autry v. Republic Prods.*,

(continued…)

23-1001

Restatement defines a "wager" as a "bargain in which a promisor undertakes that, upon the existence or happening of a condition he will render a performance . . . for which there is no agreed exchange."[114]  "Generally this condition will be a fortuitous event such as . . . a horse-race."[115]  Section 521 then recognizes that paying a fee to enter certain contests for prizes—such as cattle-exhibition or bread-making contests—does not constitute wagering if the sponsor does not compete for the prize and the entrance fees are not divided among the contestants.[116]  But section 521 expressly requires that "success in [the competition] does *not depend on a fortuitous event*," such as a horse race open to third-party wagering.[117]  So competing in a golf tournament is not wagering.  But competing in a contest to predict the result of a golf tournament is wagering because "success . . . depend[s] on a fortuitous event":  the golf tournament played by others.[118]  Likewise, because "success" in daily fantasy "depend[s] on [the] fortuitous event" of third-party athletic competitions, entry fees are wagers.

Our analysis is also consistent with *Los Angeles Turf Club v. Horse Racing Labs, LLC*, where a federal district court in the Central District of California held that the entry fees in a fantasy horse racing contest were bets.[119]  Much like draft style game players,

---

*Inc.* (1947) 30 Cal.2d 144, 148-149.  The Restatement's publication in 1932, in the same era that section 337a was enacted in 1909, makes it a useful resource in construing "wager" under section 337a.  We note that the Restatement addressed the meaning of a "wager" because wagering contracts were often unenforceable.  (See Rest., Contracts, § 512.)  The Restatement Second of Contracts, published in 1981, omitted the topic because it had become "largely governed by legislation."  (Rest.2d Contracts, Ch. 8, Intro. Note.)

[114] Rest., Contracts, § 520.  The definition also requires that the agreement "does not indemnify or exonerate the promisee or a beneficiary of the bargain for a loss caused by the existence or happening of the condition."  (*Ibid.*)  So, for example, an insurance contract is not a "wager" because it indemnifies the insured "for a loss."  (*Ibid.*)

[115] *Id.*, com. c.

[116] See Rest., Contracts, § 521 ("An accepted offer of a prize to the winner in a competition, success in which does not depend on a fortuitous event, is not a wager, if the promisor does not compete for the prize, or derive a profit or a chance of profit from payments by the contestants, and if entrance fees are not divided among the contestants"); see *id.*, illus. 1.

[117] Rest., Contracts, § 521, italics added; see Rest., Contracts, § 520, com. c (a "fortuitous event" includes a horse race or an election or other event outside the control of the wagering parties).

[118] Rest., Contracts, § 521.

[119] *Los Angeles Turf Club v. Horse Racing Labs, LLC*, No. CV 15-09332, 2017 WL 11634526 (C.D. Cal. May 15, 2017).

23-1001

contest entrants drafted a fantasy team of six or more horses, then earned points based on each selected horse's performance in a single real-life horse race.[120]   The contest charged fixed entry fees and awarded pre-announced prizes that did not depend on the number of entrants.[121]   The court held that the contest entry fees were "wager[s] . . . with respect to the outcome of a horserace."[122]   It analogized the contest's prizes to the "pot" won by the winner of a poker game, an activity that constitutes betting under California law.[123]   The contest entry fees, the court explained, "fill[ed]" the pot, with the contest sponsor contributing additional funds only if it failed to sell enough entries to pay the guaranteed prizes.[124]   The court acknowledged the skill involved in the fantasy game—noting that participants won "by virtue of their superior selection of horses"—but held that this was not inconsistent with treating the fantasy game as a type of "wagering."[125]

   *Los Angeles Turf Club* is significant not only because the court concluded that a fantasy sports contest involved "bets" or "wagers," but because it illustrates the consequences if we were to reach a contrary conclusion here.   As noted above, the California Legislature has authorized pari-mutuel wagering on horse races, in which participants compete against each other to predict race results.[126]   In doing so, the Legislature "guarantee[d] . . . protection[s]" to the public by carefully regulating betting activities—restricting, for example, where betting can take place and the amount of bets that must be returned to winners.[127]   Any "betting" or "wagering" that does not comply with these restrictions remains prohibited.[128]   But if daily fantasy games like the ones at issue in *Los Angeles Turf Club* did not involve "bets" or "wagers," then they could

[120] *Id.* at p. *3 (points were awarded based on payoff amounts at racetracks where the real-life races were held).

[121] *Ibid.*

[122] *Id.* at p. *9.   The overarching issue was whether the fantasy horse-racing contests violated a federal law, the Interstate Horseracing Act, which depended on whether the contest entry fees were bets or wagers.   (See *id.* at pp. *1, *5-*6.)

[123] *Id.* at p. *8, citing *Bell Gardens Bicycle Club v. Dep't of Just.* (1995) 36 Cal.App.4th 717.

[124] *Ibid.*

[125] *Ibid.*

[126] See Bus. & Prof. Code, § 19590; 36 Ops.Cal.Atty.Gen. 150 (1960); *ante*, fn. 32.

[127] 36 Ops.Cal.Atty.Gen., *supra*, at p. 153; 66 Ops.Cal.Atty.Gen. 94 (1983); *Youst v. Longo* (1987) 43 Cal.3d 64, 81 ("[T]he Legislature has enacted a comprehensive scheme of legislation designed to regulate almost every aspect of legalized horse racing and wagering," internal quotation marks and italics omitted).

[128] See Bus. & Prof. Code, § 19595 ("Any form of wagering or betting on the result of a horse race other than that permitted by this chapter is illegal").

potentially operate free from any of those regulations.  Games might be offered in any location, including over the Internet, and they could return any amount of money to winners.  Operators could also effectively circumvent other significant protections, including prohibitions on "wagering" by race officials, jockeys, and minors.[129]  In our view, it is unlikely that the Legislature intended that result.

Notwithstanding these authorities, the operators argue that the contest-participant exception applies because draft style game players participate in their *own* contest—the fantasy contest—separate from the underlying sports competitions.  But as regulators in Georgia and Texas have explained, this argument could allow the contest-participant "exception to swallow the rule" because any wager can be recharacterized as its "own" contest, distinct from the underlying uncertain event.[130]  Even the most ordinary sports bet—whether one team will win by at least 5 points, or whether a player will collect 7 rebounds—could be seen as a distinct contest between the sportsbook and the bettor.  The operators' argument thus threatens to collapse the distinction between participating in a contest, on the one hand, and wagering on a contest, on the other.

The operators fail to identify any persuasive argument for treating draft style games as their own competition.[131]  First, the operators argue that draft style games are their own contest because they are skill-dominant activities.  In support, they cite to *White v. Cuomo*, where the New York Court of Appeals held in a 4-3 decision that a state statute authorizing draft style daily fantasy games did not violate the state Constitution's "gambling" prohibition under a highly deferential standard of review.[132]  The Court acknowledged that daily fantasy is "distinct from spelling bees, golf tournaments, and essay competitions" because those contests "do not involve the performance of a third party."[133]  But it reasoned that daily fantasy entrants nonetheless "engage in a distinct

---

[129] See Cal. Code Regs., tit. 4, §§ 1968-1971.

[130] Ga.Atty.Gen.Memo., *supra*, at p. 4; see Ops.Tex.Atty.Gen. No. KP-0057, *supra*, at p. 7.

[131] See Comment, *Flushed From the Pocket: Daily Fantasy Sports Businesses Scramble Amidst Growing Legal Concerns* (2016) 69 SMU L.Rev. 501, 522 ("[C]ourts have drawn a distinction between 'actually participating' in a contest and being able to control or affect its outcome versus 'forecasting' the result of a contest involving others.  It intuitively makes much more sense to say that [daily fantasy] participants merely forecast the result of a contest involving others than to say that their wagering against other participants is the contest itself," internal quotation marks and italics omitted).

[132] See *White v. Cuomo* (2022) 38 N.Y.3d 209.  Because the issue was the constitutionality of a statute enacted by the Legislature, New York law required the Court to apply an "'exceedingly strong presumption of constitutionality'" and uphold the law unless it was unconstitutional "'beyond a reasonable doubt.'"  (*Id.*, at pp. 216-217.)

[133] *Id.* at p. 227.

23-1001

game of their own" because the outcome of a fantasy contest turns "on whether the participant has *skillfully* composed and managed a virtual roster so as to garner more fantasy points than rosters composed by other participants."[134]

As Justice Wilson persuasively explained in dissent, however, the "purported 'skill' involved" in daily fantasy is simply "a skill in betting."[135]  Although "some [daily fantasy] bettors 'draw from their knowledge of the relevant sport, player performance and histories, offensive and defensive strengths of players and teams, team schedules, coaching strategies,'" and related statistics "'to exercise considerable judgment in selecting virtual players,'" "the same would be true of persons placing a bet on the number of touchdowns an individual football player would score in tomorrow's game."[136]  Just as racetrack wagering is betting, "even if skill in picking . . . horses greatly affects the chance of winning," daily fantasy is betting regardless of the skill involved because success depends on forecasting "future contingent events over which the bettors have no control."[137]  In our view, the same reasoning applies to section 337a.[138]

Second, some of the operators argue that draft style game players participate in their own contest simply because the games are structured as peer-to-peer competitions, in which players compete against each other for pre-announced prizes that do not depend

---

[134] *Ibid.*, italics added.

[135] *Id.* at p. 248 (dis. opn. of Wilson, J.).

[136] *Ibid.*, quoting *id.* at p. 224 (maj. opn.); see *ibid.* (distinguishing "[s]omeone who owns a horse, trains it, and enters it into a competition in which the owner is rewarded based on the horse's performance" from a fantasy player "who assembles a slate of horses"); accord, *Ex parte McDonald*, *supra*, 86 Cal.App. at pp. 366-368 (racing contest among horse owners did not violate section 337a but contest among spectators to predict race winner did); *Los Angeles Turf Club v. Horse Racing Labs, LLC*, *supra*, 2017 WL 11634526, at pp. *6-*9 (entry fees in fantasy horse racing contest were bets).

[137] *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 249 (dis. opn. of Wilson, J.); see Ops.Miss.Atty.Gen., 2016 WL 695680, *supra*, at p. *2 (fantasy sports constitute wagering on a contingent event regardless of whether "the amount of skill [needed to win] is greater than that needed to pick which real sports team will win a particular game, or to win a game of poker, or to pick the best horse in a race"); Internal Revenue Service, Office of Chief Counsel, Memorandum No. AM 2020-009, *supra*, at p. 8 ("[T]he 'skill' involved in selecting fantasy players is similar to the skill involved in selecting winners of individual professional sports games, horse races, or other traditional sports gambling activities").

[138] See *ante*, fns. 43-53 (explaining that section 337a prohibits betting or wagering even if they are skill-dominant activities).

24

on the number of entrants.[139]  That may be a necessary condition for the contest-participant exception to apply.[140]  But it is not in itself a sufficient one.  As the Arizona Supreme Court has persuasively reasoned in construing a statute similar to section 337a, the exception also requires that "prizes are not awarded on the basis of the outcome of some event involving third parties."[141]  Were the rule otherwise, any type of ordinary sports betting could be made legal if it were offered in a peer-to-peer format, dramatically reducing section 337a's coverage.  Instead of offering an against-the-house wager to predict the winner of a football game, for example, a sportsbook could offer a two-person, head-to-head contest to predict the game winner, matching entrants who wished to make opposing predictions.  We see no evidence that the Legislature intended to allow these types of games, which mimic traditional bilateral wagering and pose similar risks of addiction and financial injury.  In our view, a contest to determine who is the best sports bettor still involves sports betting.[142]

To be sure, the peer-to-peer format of the draft style games means that players do not bet against the game operators.  Where an operator offers a prize that it will always distribute to one of the participants, the operator itself is not "betting"; its gain or loss does not depend on the outcome of the uncertain future event.[143]  But just because the operator is not betting against the players does not mean that the players are not betting against each other.[144]  Pari-mutuel wagering on horses, for example, is operated on a peer-to-peer basis, yet participants clearly bet against one another.[145]  We have previously concluded that participants in a lottery also place "bets" or "wagers" on the

---

[139] Cf. *Humphrey v. Viacom, Inc.*, No. 06-CV-2768, 2007 WL 1797648 (D.N.J. June 20, 2007) (concluding that season-long fantasy sports contest did not involve betting under New Jersey law due in part to peer-to-peer contest structure).

[140] See, e.g., *State v. Am. Holiday Ass'n, Inc.*, *supra*, 151 Ariz. at pp. 314-316; Rest., Contracts, § 521; compare *Las Vegas Hacienda, Inc. v. Gibson*, *supra*, 77 Nev. at pp. 27-30 (hole-in-one golf shot was not betting even though the contest was not operated on a peer-to-peer basis), discussed *ante*, fns. 58-62.

[141] *State v. Am. Holiday Ass'n, Inc.*, *supra*, 151 Ariz. at p. 314, discussed *ante*, fns. 94-102; see Rest., Contracts, § 521, discussed *ante*, fns. 113-118.

[142] Cf. *Tschetschot v. Comm'r* (Tax Ct. 2007) 93 T.C.M. (CCH) 914, *3 (rejecting the argument that, unlike regular poker, a poker *tournament* did not involve "betting" or "wagering"; "simply because a sport or activity is played or conducted in a tournament setting does not transform the underlying activity into something different").

[143] See *Western Telcon*, *supra*, 13 Cal.4th at pp. 485-489.

[144] See Nev.Atty.Gen.Memo., *supra*, at pp. 9, 11.

[145] See *ante*, fns. 12-13, 32, 128.

game result by buying lottery tickets.[146]  And the federal district court in *Los Angeles Turf Club* likewise concluded that players who competed in a peer-to-peer fantasy contest to win pre-announced prizes engaged in wagering.[147]  Similarly, players in draft style games place bets on the outcome of the third-party athletic events.

Third, the operators argue that draft style games are their own contest because winners are not determined by "the outcome of any particular real-life athlete's performance or on the score sheet of any sporting event" but instead based on multiple real-world game statistics, combined pursuant to a designated formula.[148]  But as explained above, section 337a prohibits wagering on any type of game attribute, not just the ultimate winner.[149]  And many forms of sports wagering turn on complex combinations of game statistics.[150]  Horse-race wagering, for example, offers "exotic" parlay bets that award prizes based on myriad combinations of predicted race results.[151]  In sum, daily fantasy may "involve betting on the performances of a collection of

---

[146] See 105 Ops.Cal.Atty.Gen. 76 (2022) (concluding that lottery tickets constitute amounts "staked, pledged, bet or wagered . . . upon the result . . . of any lot, chance, [or] casualty" under section 337a(a)(3)); 82 Ops.Cal.Atty.Gen. 87 (1999) (same).  We note that a lottery's prize pool may either be made up of pooled entry fees, as in pari-mutuel horse racing, or it "may involve fixed prizes" determined "in advance of the draw," like in the draft style games.  (*Western Telcon*, *supra*, 13 Cal.4th at p. 490.)

[147] See *Los Angeles Turf Club v. Horse Racing Labs, LLC*, *supra*, 2017 WL 11634526, at pp. *8-*9 (refusing to follow *Humphrey v. Viacom, Inc.*, discussed *ante*, fn. 139).

[148] *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 227.

[149] See *ante*, fns. 54-57.

[150] See, e.g., 36 Ops.Cal.Atty.Gen., *supra*, at p. 153 ("The difference between selecting the winners in one, two, three or six races is one of degree and not of kind"); Betting the Line, *supra*, at p. 176 (noting the "hundreds of proposition bets" offered around major football matches, "from those that reflect the evaluation of playing skills (will John Elway of the Denver Broncos complete more passes than Chris Chandler of the Atlanta Falcons?), . . . to the ludicrous (will the total points scored by both teams plus 16 points equal the number of strokes Tiger Woods takes in a golf tournament played the same day?)").

[151] See *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 249 (dis. opn. of Wilson, J.) (the "same arguments made to urge that [daily fantasy sports are] not gambling could have been made about horse racing" given the many complex horse-race wagers—such as the "trifecta box," the "pick six," and the "exacta part wheel," which require predicting different combinations of the first, second, or third place results of one or more races).

individual players, rather than the performance of a real team."[152]  But it nevertheless "involve[s] betting on sports outcomes."[153]

Finally, some operators argue that the draft style games are their own contest because they fall within the Business and Professions Code's definition of a regulated "contest."[154]  Games falling within that definition are subject to disclosure requirements, but are not prohibited.[155]  The statute broadly defines a "contest" to include "any game" in which participants pay consideration to "compete for . . . prizes" where winning is "determined by skill or any combination of chance and skill."[156]  But the statute makes clear that it shall not "be construed to permit any contest . . . that is prohibited by any other provision of law."[157]  As a result, whether draft style games qualify as "contests" or not, they are prohibited by section 337a because they involve wagering on sports.[158]

**We Cannot Opine as to Whether Daily Fantasy Sports Games Are a Lottery**

Although we conclude that section 337a prohibits daily fantasy sports games, we cannot determine whether they are also barred by California's prohibition of lotteries. The California Constitution provides that the "Legislature has no power to authorize lotteries, and shall prohibit the sale of lottery tickets in the State."[159]  Consistent with that

---

[152] *Id.* at p. 242 (dis. opn. of Wilson, J.).

[153] *Ibid.*; see Oh.Atty.Gen.Memo., *supra*, at p. 7 ("[W]hile [daily fantasy] may be a more sophisticated form of sports betting—in that the outcome is based on the statistics of individual participants rather than the outcome of the game itself—it appears to be betting under Ohio law nonetheless"); accord, *Edgewood Am. Legion Post No. 448 v. United States* (7th Cir. 1957) 246 F.2d 1, 4-5 (contest to predict the number of runs scored in baseball games throughout a season constituted "wagering" under federal excise wagering tax, even though success did not turn "on the result of any particular game"; the winner was "determined by reference to the happenings of a sports event," so the "particular manner in which such event was used in determining the winner [was] beside the point").

[154] Bus. & Prof. Code, § 17539.3, subd. (e).

[155] See Bus. & Prof. Code, § 17539 et seq.

[156] Bus. & Prof. Code, § 17539.3, subd. (e).

[157] *Id.*, subd. (c).

[158] The opinion request asks only about the legality of *daily* fantasy sports games.  We therefore need not consider whether *season-long* fantasy sports fall outside of section 337a, such as whether the greater degree of player interaction in those games suggests that players are participating in their own contest.

[159] Cal. Const., art. IV, § 19, subd. (a).

directive, the Penal Code prohibits lotteries and lottery-ticket sales.[160]  A "lottery is defined by three elements":  consideration, a prize, and distribution by chance.[161]  Consideration "is the fee . . . that a participant pays the operator for entrance."[162]  A prize "encompasses property that the operator offers to distribute to one or more winning participants and not to keep for himself."[163]

Relevant here, distribution by chance "means that winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill."[164]  When a game combines elements of skill and chance, the question is which is "the dominating factor in determining the result."[165]  In making that determination, courts look to "the character of the game as revealed by its rules."[166]  Applying these principles, California courts have reached a series of fact-specific conclusions.  For example, courts have held that skill predominates in archery and chess, but chance predominates in a game determined by drawing tickets from a container.[167]

---

[160] See Penal Code, § 319 et seq; *Hotel Emps. & Rest. Emps. Int'l Union v. Davis* (1999) 21 Cal.4th 585, 591.  As noted above, state law contains several exceptions not relevant here.  (See *ante*, fn. 21.)

[161] *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, *supra*, 21 Cal.4th at p. 592; see Penal Code, § 319 ("A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known"); see also 71 Ops.Cal.Atty.Gen., *supra*, at p. 145.

[162] *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, *supra*, 21 Cal.4th at p. 592.

[163] *Ibid.*

[164] *Ibid.*

[165] *Finster v. Keller*, *supra*, 18 Cal.App.3d at p. 844.

[166] *Bell Gardens Bicycle Club v. Dep't of Just.*, *supra*, 36 Cal.App.4th at p. 722.

[167] See 71 Ops.Cal.Atty.Gen., *supra*, at pp. 146-148 (collecting cases); see, e.g., *In re Allen* (1962) 59 Cal.2d 5, 7 (bridge is a game of skill); *Brown v. Bd. of Police Comm'rs of City of Los Angeles*, *supra*, 58 Cal.App.2d at p. 477 ("[S]hooting at a target is a game of skill"); *id.* at pp. 477-479 (ball-tossing carnival game was a game of skill); *Finster v. Keller*, *supra*, 18 Cal.App.3d at pp. 844-846 (contest to predict the winner of six horse races was a game of chance); *Bell Gardens Bicycle Club v. Dep't of Just.*, *supra*, 36 Cal.App.4th at pp. 747-753 (chance predominated in jackpot feature of poker game);

(continued…)

23-1001

Here, we are unable to opine as to whether daily fantasy games satisfy the distribution-by-chance requirement. Attorney General opinions under Government Code section 12519 are limited to "question[s] of law."[168]  But whether skill or chance predominates is a question of fact.[169]  Although the answer will sometimes be clear, games like daily fantasy sports that combine elements of skill and chance pose a closer question.[170]  Resolving the issue here, for example, might require evaluating expert statistical analyses—a fact-intensive undertaking far outside our purview.[171]  And the answer might also vary by game, given differences in rules or administration.[172]  Because we cannot determine whether skill or chance predominates, we cannot opine as to whether daily fantasy sports are also prohibited as lotteries under Penal Code section 319 et seq.[173]

---

*People v. Shira* (1976) 62 Cal.App.3d 442, 462 (chance predominated in "RINGO" game that combined chance elements of Bingo and skill elements of a ring toss); see also 17 Ops.Cal.Atty.Gen. 63, 64 (1951) (Bingo game variations involving relatively minor skill elements were games of chance); Cal.Atty.Gen., Indexed Letter, No. I.L. 74-145 (Aug. 9, 1974) (Attorney General Indexed Letter concluding that backgammon is a game of skill, despite chance element from dice rolls).

[168] Gov. Code, § 12519; see also 62 Ops.Cal.Atty.Gen. 150, 163 (1979) ("The function of this office is not to resolve factual disputes, or disputes as to conflicting inferences which may arise from such facts, but to render opinions on legal questions"); 105 Ops.Cal.Atty.Gen. 39, 39 (2022).

[169] See *Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 732 (whether skill or chance dominates is a "fact question for the trial court"); *People v. Settles* (1938) 29 Cal.App.2d Supp. 781, 787 (where game has elements of both skill and chance, the question of which dominates "is ordinarily one of fact").

[170] See *State ex Inf. McKittrick v. Globe-Democrat Pub. Co.* (1937) 341 Mo. 862, 875 ("Whether the chance factor is dominant or subordinate is often a troublesome question").

[171] See *post*, fn. 184; see, e.g., *Brown v. Bd. of Police Comm'rs of City of Los Angeles*, *supra*, 58 Cal.App.2d at p. 479 (appellate court was "unable to say as a matter of law" whether skill or chance predominated; question "was for the trial court to determine").

[172] See *post*, fns. 185-186.

[173] See Nev.Atty.Gen.Memo., *supra*, at p. 16 ("[T]he vast majority of daily fantasy sports require some level of skill on the part of the owners.  Because the level of skill involved is a question of fact, each individual simulated game must be examined by a finder of fact, who will determine this issue on a case-by-case basis"); but see Ops.R.I.Atty.Gen., Daily Fantasy Sports, p. 2 (Feb. 4, 2016) (concluding that skill predominates in daily fantasy sports, without considering whether the issue is one of fact or law).

Given the considerable interest here, however, we will describe the principal contentions on both sides of the skill-versus-chance debate to clarify the issues. To begin with, the daily fantasy sports operators argue that skill predominates in daily fantasy sports because successful players act like virtual talent scouts or general managers, carefully analyzing the underlying athletic events. "Participants draw from their knowledge of the relevant sport, player performance and histories, offensive and defensive strengths of players and teams, team schedules, coaching strategies, how certain players on opposing teams perform against each other, [and] statistics" in making their roster selections.[174] Participants may also consider the fantasy scoring system, as well as the likely draft choices of other players.[175]

Other comments we received, in contrast, argue that chance predominates in daily fantasy sports because winners are determined based on a single sporting event per athlete. And a host of factors can influence an athlete's single-game performance, including unexpected weather conditions, last-minute injuries, player ejections, referee decisions, and athlete well-being.[176] For these and other reasons, an athlete's performance can vary widely from game to game. A basketball player who averages six rebounds per game, for instance, could collect as few as zero or as many as eleven rebounds in an individual game—such that the athlete's fantasy-point contributions will vary significantly as well.

Both sides also analogize to California case law. The operators emphasize *In re Allen*, where the Supreme Court held that bridge is a game where skill predominates.[177] The Court acknowledged the "element of chance resulting from the deal of the cards."[178] But it reasoned that skill nonetheless dominated given the complexity of bridge technique; the importance of "deductive analysis, psychology, [and] alertness"; and the "large amount of literature" devoted to improving skill at the game.[179] Commenters on the other side analogize to *Finster v. Keller*, where the Court of Appeal held that chance

---

[174] *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 224; see Ops.W.Va.Atty.Gen., 2016 WL 3857081, *supra*, at pp. 9-11 (enumerating skill elements in daily fantasy, which are "similar" to the skill elements in ordinary sports betting).

[175] *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 224.

[176] See Ops.Tex.Atty.Gen. No. KP-0057, *supra*, at pp. 4-6 (enumerating chance elements in daily fantasy); accord, *Com. v. Laniewski* (1953) 173 Pa.Super. 245, 250 (traditional sports bettors can forecast results based on "[p]ast records, statistics and other data," but "[n]o one knows what may happen once the game has begun" due to the "many unpredictable elements" of competition).

[177] *In re Allen*, *supra*, 59 Cal.2d at p. 7.

[178] *Ibid.*

[179] *Ibid.*, internal quotation marks omitted.

predominated in a contest to pick the winner of six horse races.[180]  The court cited statistics suggesting the difficulty of forecasting multiple race results.[181]  And it distinguished *Allen* on the basis that bridge players "continue to make their individual judgments until the hand has been played," thereby exercising "some control over the outcome," whereas in the horse racing contest, "all opportunity for the player to exercise judgment ceases when the" first relevant race began.[182]  "The actual outcome of any race then depends upon elements wholly beyond the control of the player."[183]

Next, the operators cite a series of empirical studies—many sponsored by the companies themselves—concluding that skill plays a role in daily fantasy sports.[184]  As noted above, we are not in a position to evaluate the methodology or validity of these studies.  We note, though, that one study suggests that the degree of skill in some daily fantasy sports formats may vary considerably between games.  In the draft style games that employ a salary cap draft, one source of skill is to identify athletes whose fantasy salaries are low relative to their average performance:  if an athlete's salary is less than "the expected payoff," "skilled fantasy players can capitalize."[185]  But whether athletes are undervalued, and by how much, may vary significantly based on the operator's algorithm for pricing salaries.  As a result, the degree of skill in these games may vary widely between operators.  Indeed, one of the operators' studies concluded that if a game employs "perfect pricing"—where each athlete's salary "exactly mirrors their expected payoff"—then "there is no strategy in assembling a lineup (other than to get as close to the salary cap as possible) and the outcome of the fantasy game is determined purely by luck."[186]

Finally, the operators cite two out-of-state cases considering skill in daily fantasy sports, but both have important limitations.  First, in *Dew-Becker v. Wu*, the Illinois Supreme Court concluded that skill predominates in daily fantasy sports games, relying

---

[180] *Finster v. Keller*, *supra*, 18 Cal.App.3d at pp. 844-846.

[181] See *id.* at pp. 841, 845.

[182] *Id.* at p. 844.

[183] *Ibid.*

[184] See, e.g., Gaming Laboratories International, Skill Simulation of *DraftKings Daily Fantasy Basketball Contest* (June 25, 2015) (concluding that fantasy athlete rosters selected at random underperformed rosters chosen by skilled players); Daniel Getty et al., Luck and the Law: Quantifying Chance in Fantasy Sports and Other Contests, 60 SIAM Rev. No. 4, 869 (Jan. 2018) (Luck and the Law) (concluding that skill predominates in some fantasy sports variants).

[185] Luck and the Law, *supra*, at p. 884.

[186] *Ibid.*

on the above studies.[187]  But the studies received no adversarial testing:  they were not included "in the record" or cited by either party, and the Court itself did not "engage in its own analysis of the studies' validity or credibility."[188]  The California Supreme Court has declined to rely on statistical studies in similar circumstances.[189]

Second, in *White v. Cuomo*, discussed above, the New York Court of Appeals held in a 4-3 decision that a state statute authorizing daily fantasy sports games did not violate the State Constitution's "gambling" prohibition.[190]  The Court relied in part on the operators' studies, which it interpreted to "show[] that skilled [daily fantasy] players achieve significantly more success."[191]  But New York law required the Court to apply an "exceedingly strong presumption" that the statute was constitutional and uphold it if there could "be discovered any state of facts . . . which could reasonably be assumed to afford support for the legislative decision."[192]  Because this opinion request poses no comparable questions under the California Constitution, the case provides limited guidance on the issues of California law presented here.

In sum, we agree with one commentator that "it is difficult to predict with certainty whether a court would find skill or chance to predominate" in daily fantasy sports.[193]  Such an inquiry could "rely heavily upon expert testimony and a fact intensive investigation," and the result could "vary based on the specific nature of each individual contest."[194]  For these reasons, resolving the issue of whether daily fantasy sports games constitute illegal lotteries is outside the scope of an Attorney General legal opinion under Government Code section 12519.  But we reiterate that this circumstance has no bearing

---

[187] *Dew-Becker v. Wu* (Ill. 2020) 178 N.E.3d 1034, 1040-1041.  In dissent, Justice Karmeier concluded that chance predominates in daily fantasy sports games because "the outcome of the contest relies entirely on a contingent event that the participant lacks all control over, and there is no subsequent opportunity for the participant to overcome the chance involved."  (*Id.* at p. 1045; see *id.* at pp. 1042-1045 [collecting cases to support the dissent's analytical framework].)

[188] *Id.* at p. 1042 (dis. opn. of Karmeier, J.).

[189] See *People v. Hardin* (2024) 15 Cal.5th 834, 862 ("adversarial testing" of statistical studies provides "insight into [both] the methodology employed [and] the ultimate accuracy or significance of the results").

[190] See *White v. Cuomo*, *supra*, 38 N.Y.3d at p. 212.

[191] *Id.* at p. 223.

[192] *Id.* at pp. 217, 224-225, internal quotation marks omitted; see *ante*, fn. 132.

[193] Edelman, *Navigating the Legal Risks of Daily Fantasy Sports:  A Detailed Primer in Federal and State Gambling Law* (2016) 2016 U.Ill. L.Rev. 117, 132.

[194] *Id.* at pp. 132-133.

on our independent determination that such games violate California law under section 337a's prohibition against betting on sports.

## CONCLUSION

We conclude that daily fantasy sports games, including both pick'em and draft style games, are prohibited by section 337a because they involve betting on sporting events.

23-1001